IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANDRE VIRUEZ, § | | |
| § | | |
| **Plaintiff** § | | |
| § | | |
| s. § | | Civil Action No._____ |
| § | | |
| **THE LINCOLN NATIONAL LIFE** § | | |
| **INSURANCE COMPANY f/k/a** § | | |
| **LIBERTY LIFE ASSURANCE** § | | |
| **COMPANY OF BOSTON,** § | | |
| § | | |
| **Defendant.** § | | |

## ORIGINAL COMPLAINT

Andre Viruez ("Plaintiff" or "Viruez") files this Complaint against The Lincoln National Life Insurance Company ("Lincoln").

### I.  PARTIES

1. Plaintiff, Andre Viruez, is an individual and resident of Bexar County, Texas.

2. Lincoln is an insurance company licensed to do business in Texas and is incorporated under the laws of the State of Indiana with its principal place of business in Fort Wayne, Indiana. Lincoln can be served with citation by serving its Attorney for Service, Corporation Service Company, by certified mail, return receipt requested, at 211 East 7th St., Suite 620, Austin, Texas 78701-3218.

### II.
### JURISDICTION AND VENUE OF ERISA CLAIMS

3. This action against Lincoln arises under the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. §1001 *et. seq.*

4. This Court has jurisdiction over the action pursuant to 29 U.S.C. § 1132(e)(1).

5. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the breach occurred in this district.

## III.
## FACTUAL BACKGROUND

**A.   Viruez Ceased Working Due to Disability and Lincoln Denied His Claim for STD Benefits.**

6. Charter Communications ("Charter") employed Viruez as Representative for Inbound Telesales, which was a sedentary occupation that required him to perform the following physical and mental demands, which included, but were not limited to: (1) frequently use a computer keyboard to type; (2) frequently lift up to 10 pounds; (3) frequently sit; (4) frequently engage in problem solving; (5) frequently make decisions; (6) frequently write; and (7) frequently concentrate.

7. Viruez began his employment at Charter on July 2022, 2018. As a Charter employee, Viruez was a participant in Charter's health and welfare benefit plan (the "Plan") that provided group short- and long-term disability ("STD" and "LTD") benefits to its employees. His coverage under the Plan became effective January 1, 2019.

8. The Plan paid STD and LTD benefits to qualified Charter employees through a group disability policy issued by Lincoln (the "Policy"). The Policy paid up to 24 weeks of STD benefits in an amount that was generally calculated by multiplying 60 times the employee's weekly benefit. After that, it would determine whether a claimant was eligible for LTD benefits

9. The definition of "disability" in the policy for employees seeking STD benefits meant "the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his "Own Job." "Material and Substantial Duties" meant responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified."

10. The Policy further provided that a "Pre-Existing Condition" was an exclusion that meant the "Policy will not cover any Disability or Partial Disability:"

1. Which is caused or contributed to by, or results from, a "Pre-Existing Condition; and

2. Which begins the first 12 months immediately after the Covered Person's effective date of coverage, unless he received no Treatment of the condition for any six consecutive months after his effective date of coverage.

"Pre-Existing Condition means a condition resulting from an Injury or Sickness from which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage."

11. While insured under the Policy, Viruez ceased working on January 22, 2019 due to severe symptoms associated with post-traumatic stress disorder ("PTSD").

12. On or about January 30, 2019, Viruez applied for STD benefits under the Plan due to his PTSD, but Lincoln treated his claim as if he was claiming disability due to all of his medical conditions. Lincoln also suspiciously and immediately launched an investigation into whether Viruez's medical conditions were pre-existing conditions for which coverage under the Policy was barred.

13. On the same date Lincoln launched its investigation, Mallory Syndor, a Disability Claim Manager, called Viruez to interview him regarding his claim. They discussed why Viruez stopped working, created a list of his treating physicians, including Dr. Kevin Hodnett and Dr. Kumar Reddy, and stated he was currently waiting for a referral to a psychiatrist. Viruez also advised Syndor he had recently experienced a mini-stroke and that he was under a lot of stress. After her call with Viruez ended, she requested his medical records from the Emergency Room at Baptist Shavano Park, his family practitioner, his gastroenterologist, and his rheumatologist, even though Viruez claimed he was disabled due to PTSD, and not from his various physical illnesses.

14. On February 5, 2019, less than a week after Viruez made his claim, Syndor wrote

3

Viruez a letter to advise him Lincoln had determined that Viruez's absence from work might be subject to the Policy's exclusion for pre-existing conditions. Based on that finding, Lincoln would perform an investigation to determine if he received any treatment for his disabling conditions in the three months prior to the date his coverage became effective under the Plan or January 1, 2019. Thus, the pre-existing condition period was from October 1, 2018 to December 31, 2018. Sydnor also asked Viruez to provide her with a list of all his medical providers and told him he had a burden to present proof of his disability by March 30, 2017.

15. In January 2019, Viruez began to see two new doctors—Dr. Kevin Hodnett, a family practitioner, and Christina Wei, an advanced practice registered nurse who owns Alamo Elite Wellness, a mental health center, and who treats mental illness at her practice.

16. Viruez first saw Dr. Hodnett on January 28, 2019. At the visit he complained he was suffering from fatigue, difficulty concentrating, memory loss, insomnia, feelings of guilt, anhedonia, racing heart palpitations, and a depressed mood. Viruez told Dr. Hodnett that he was the first doctor he had seen in the United States to discuss his mental health issues—in other words, in years. He also advised Dr. Hodnett that he was being deeply affected by memories of observing his brother's murder when he was 16 and his own subsequent kidnapping and torture in Bolivia. Dr. Hodnett believed Viruez possibly had PTSD and major depressive disorder, but prescribed him with clonazepam and Wellbutrin to treat his mental health symptoms. He was unaware clonazepam is antithetical to treatment for PTSD and Wellbutrin is only a second line drug to treat PTSD.

17. Viruez saw Dr. Hodnett again on February 4, 2019, where he complained he had not observed any difference in his symptoms since he started taking Wellbutrin, still had dizziness, experienced intolerance to different sensory input including noises and lights, and still had insomnia. Dr. Hodnett described Viruez as a "gentleman with depression, anxiety, and possibly PTSD. He had suffered some trauma in the past." While Dr. Hodnett believed Viruez's complaints

4

might be related to his mental illnesses, he thought he should refer Viruez to a neurologist for a workup.

18.     Given his lack of expertise regarding mental health issues, Dr. Hodnett referred Viruez to Christina Wei because he believed Viruez may be suffering from major depression or possibly PTSD.  Viruez saw Wei for the first time on February 8, 2019.  Viruez told Wei he could not "function anymore" and he could not focus on anything anymore, including TV.  He also disclosed he spent his time thinking about things he hadn't accomplished in life, what he was going to do in the future, and that there was no meaning to life anymore.  He told her he had not worked in two weeks because he became very annoyed and irritated about everything at work, he couldn't withstand the loud noises at work, and he had become very forgetful on the job.  He also divulged he had begun to have nightmares about his brother's murder.[1]  After their visit, Wei diagnosed Viruez with PTSD for the first time.  No other doctor had ever given Viruez this diagnosis.  She prescribed him sertraline, which is a first line drug to treat PTSD, took him off of Wellbutrin and started weaning him off the clonazepam because it was dangerous for people with PTSD to take.

19.     On February 11, 2019, Viruez called Sydnor to notify her he had seen a mental health professional who had diagnosed him with PTSD for the first time and had prescribed him sertaline.

20.     On March 3, 2019, Sydnor referred Viruez's claim to Jennifer Schneider, a nurse case manager employed by Lincoln, to review the medical records Lincoln had received to date. Schneider reviewed the records and listed all the medical conditions from which Viruez suffered. It is obvious from reading Schneider's report that she was attempting to portray Viruez's new diagnosis of PTSD as a previous diagnosis and to also portray his associated symptoms as if they had been ongoing for a while.  Schneider's comments about Viruez's medical records are all given

---

[1] His brother's murderer was released from prison in January 2019, which obviously coincided with the start of Viruez's nightmares.

with this goal in mind.

21. For example, she described Viruez's first appointment with Dr. Hodnett as if it focused solely upon his complaints of dizziness, intolerance for exercise, and shortness of breath and misrepresented Dr. Hodnett had acknowledged Viruez had been diagnosed with PTSD in the past, when he had not.

22. Schneider reported that at Viruez's second visit with Dr. Hodnett, Dr. Hodnett believed his symptoms were exacerbated by his mental illnesses and/or neurological issues.

23. Next, Schneider misrepresented the discussions Viruez had with Wei during his February 8, 2019 appointment with her. She stated Viruez "reports having ongoing symptoms relating to the trauma of his brother dying when he was 16 years old, has recently been feeling escalation of frustration, anger, depression, irritability, dizziness, and anxiety." Wei did not report that she and Viruez had this conversation.

24. At the end of Schneider's report, she recommended Lincoln gather medical records from additional medical providers from whom Viruez had sought medical treatment, then refer Viruez's claim to one of Lincoln's in-house medical directors.

25. After obtaining the additional records, Schneider created a Nursing Memorandum. As with her initial review, Schneider briefly summarized the medical conditions for which Viruez had been treated and the dates of those treatments. She unsurprisingly gave Viruez's diagnosis of PTSD very little attention, only discussing he had been prescribed clonazepam for anxiety during the pre-existing condition period. Schneider did not repeat her recommendation that Sydnor refer Viruez's claim to one of Lincoln's medical directors.

26. After obtaining Schneider's memorandum, Sydnor decided to deny Viruez's claim without any apparent basis other than broadly applying the pre-existing condition exclusion in the Policy. Danielle Robinson, Sydnor's manager, agreed with her decision to deny Viruez's claim.

27. On March 21, 2019, Lincoln advised Viruez by letter that it had denied his claim for STD benefits based on the pre-existing exclusion under the Policy. That is, it claimed Viruez suffered from and was treated for the following medical conditions listed on his application for STD benefits—dizziness and giddiness, inflammatory joint pain, Sjogren's Syndrome, bilateral knee pain, back pain, anxiety, depression, migraines and PTSD—during the applicable pre-existing condition period of October 1, 2018 to December 31, 2018. Lincoln ignored the fact that Viruez's claim for STD benefits was based on his new diagnosis of PTSD.

28. Additionally, Lincoln's decision ignored important evidence or, more appropriately, a lack of evidence. In its letter, Lincoln admits Viruez was treated for PTSD in January 2019—a date that occurred outside the pre-existing condition period and the only medical evidence it attempted to point to to argue PTSD was a pre-existing condition was that he was treated for anxiety during that period.

29. After Viruez learned his claim had been denied, he asked Dr. Hodnett to write a letter to Lincoln. Dr. Hodnett told Lincoln Wei believed most of Viruez's symptoms were caused by "an acute new onset PTSD." He also stressed that Viruez was unable to fulfill his duties of his job and will need ongoing outpatient therapy until he can return to work.

30. On April 3, 2019, Viruez submitted his appeal of Lincoln's decision to deny his claim for STD benefits. His appeal included a letter from him, a letter authored by Dr. Hodnett on April 1, 2019, updated medical records from his visits with Wei, and pharmacy records.

48. In his letter, Viruez stressed that many of the medical diagnoses Lincoln listed in his denial letter were not relevant to his inability to work—indeed he had no trouble working before he began experiencing the symptoms of PTSD in January 2019. Wei concluded Viruez had PTSD—a diagnosis he had never received from a medical provider before. He also advised Lincoln Dr. Hodnett had instructed him not to return to work at least until he had a psychiatric

evaluation, which was done by Wei, and had finished outpatient treatment for his PTSD.

49. Viruez also included a March 4, 2019 office visit note with Wei. She noted noted Viruez's brother had been murdered and his killer had just been released from prison in January 2019. After learning that fact, Viruez began suffering from paranoia, anxious tachycardia (abnormal heart rhythms caused by stress), increased agitation and irritability, and insomnia. She also mentioned Viruez thought of his brother and whether he was okay constantly, and at night he suffered from insomnia due to grisly dreams about his brother. Wei remarked Viruez was tearful throughout their session.

50. Finally, Viruez provided Lincoln with his CVS pharmacy records from the period of July 1, 2018 to December 31, 2018. They showed Viruez had not been prescribed any medications used to treat anxiety or depression during that period.

51. On April 15, 2019, Ferguson referred Viruez's claim for a review by one of Lincoln's Consulting Physicians. Her referral form specifically cited to the DSM 5—the Diagnostic and Statistical Manual of Mental Disorders—a guidebook created by clinicians and researchers around the world for use by mental health professionals to determine the symptoms and criteria they can use in order to diagnose patients with mental disorders. Indeed, Ferguson expressly asked the physician to use the DSM-5 to evaluate Viruez's diagnosis of PTSD. [2]

52. Lincoln assigned Derek A. Stern Ph.D, an employee of Lincoln who had an obvious incentive to conclude Viruez's PTSD was a pre-existing condition, to perform the review.

51. On April 24, 2010, Tara Ferguson, an Appeal Review Consultant for Lincoln, wrote Viruez a letter asking him to comment on the so-called "clinical assessment" authored by Dr.

---

[2] Exhibit 1.3-4 DSM-5 Diagnostic Criteria for PTSD is attached as Exhibit A. The DSM-5 was recently amended to include symptoms people were commonly experiencing with PTSD, but were not in the book. It was also amended to remove PTSD from the section relating to Anxiety Disorders to a new chapter on Trauma- and Stress- or- Related Disorders.

8

Stern. It was entirely inappropriate for Lincoln to ask Viruez to complete this task rather than Dr. Hodnett or Christina Wei and it is not a standard practice in the insurance industry.

53. Dr. Stern reached his opinion PTSD was a preexisting condition based upon the following completely unreliable and nonsensical evidence: (1) Viruez took the prescribed drugs clonazepam and iscitalopram during the pre-existing condition period—drugs that exacerbate PTSD, not treat it; (2) Dr. Stern relied upon Dr. Hodnett's misstatement in a January 28, 2019 office visit note that Viruez had seen a psychiatrist when he lived in Bolivia and that doctor diagnosed him with PTSD—which is refuted by the statements of Viruez and Dr. Hodnett; (3) Wei stated in one of her office visit notes that Viruez had symptoms of PTSD, which although can include symptoms of anxiety and depression, are separate and distinct diagnoses from PTSD; and (4) Viruez's symptoms of anxiety and depression were inextricably intertwined with his eventual diagnosis of PTSD. He did not refer to the DSM-5 once in rendering his conclusions, although Ferguson asked him to do exactly that.

54. Despite his lack of expertise, Viruez responded to Ferguson's April 24, 1999 letter. In a May 1, 2019 letter, Viruez successfully refuted Dr. Stern's statements and opinions. Viruez stated, among other things, that:

- During the period when Dr. Stern claimed Viruez was taking clonazepam and iscitalopram, he actually was not. Dr. Stern misread the portion of the medical records from Viruez's cardiologist where Viruez was asked what drugs he had been prescribed in the past, and he gave the nurse clonazepam and iscitalopram, which he had not taken since 2007 (they were used to treat different symptoms than what Viruez was experiencing now) and did not start taking clonazepam again until January 1999 when Dr. Hodnett prescribed it;

- Despite Dr. Stern's fictional description of Viruez and Dr. Hodnett's discussions about the murder of Viruez's brother, Viruez told Dr. Hodnett about his brother's murder and that he had never mourned his death or had given much thought to the murder until then. He also told Dr. Hodnett he was kidnapped and tortured in Bolivia in 2009 and that experience had never affected his life until two weeks after Christmas 2018. Viruez then advised Dr. Hodnett that as a result of these traumatic events he was unable

9

    to tolerate being around his co-workers or withstand noise and he was very irritable. Viruez emphasized that Dr. Hodnett believed he was going through his first episode of PTSD and as a result he referred her to Christine Wei.

- Viruez emphasized he had not taken any prescriptions to treat his anxiety or depression during the pre-existing condition period as shown by his pharmacy records and he had not been diagnosed with PTSD until he met with Christina Wei on February 8, 2019.

- During his initial visit with Wei, Wei diagnosed him with a first episode of acute PTSD and instructed him not to return to work until finalizing his treatment. Wei also opined he was just now experiencing the symptoms of PTSD, such as paranoia, because his brother's murderer had just been released from prison in January 2019.

55. After Viruez submitted his appeal, Dr. Hodnett sent Lincoln a letter dated May 3, 2019. He had learned of misstatements made by Lincoln regarding when Viruez was first diagnosed with PTSD—*i.e.,* that he had been diagnosed with PTSD in Bolivia at some point in the past. Dr. Hodnett notified Lincoln that during his initial visit with Viruez, he "misunderstood in my initial note that patient was first diagnosed with PTSD in Bolivia. After more in depth conversation with the patient it has become clear to me that the first time that [Viruez] heard of PTSD was when I mentioned it during our [initial] visit."

56. Dr. Hodnett further stated that there was strong evidence Viruez had not been diagnosed with PTSD in Bolivia. This is because a medical provider in Bolivia prescribed Viruez with clonazepam, a drug that is not recommended for the treatment of PTSD because it can prolong and worsen the symptoms of the disorder.

57. Dr. Hodnett also reviewed Viruez's medical records and did not see a single reference to PTSD in them. Although his records indicated he may have suffered from depression in the past, Dr. Hodnett correctly stressed "depression and PTSD are two distinct diagnoses."

58. Ferguson simply acknowledged Lincoln's receipt of Viruez's appeal and Dr. Hodnett's letter and did not comment on the substance of those documents. Instead, she referred

Viruez's claim yet again to Dr. Stern to create an addendum to his memorandum based on his review of the appeal and Dr. Hodnett's letter. She once again asked Dr. Stern to refer to the DSM-5 in his analysis.

59.     Unsurprisingly, this evidence of Viruez's disability due to PTSD did not cause Dr. Stern to have a change of heart as evidenced by his May 16, 2019 Memorandum. Indeed, his position as a Medical Director requires him to find a basis to conclude claimants for disability benefits are healthy enough to work—whether it is true or not.

60.     After reviewing the appeal and letter, Dr. Stern surprisingly readily acknowledged there were inaccuracies in the medical records, including (1) any reference to treatment for depression included in the records of Viruez's cardiologist; (2) any reference to prior treatment or diagnosis of PTSD while Viruez was in Bolivia; (3) inaccuracies regarding when Viruez had been prescribed clonazepam; and (4) any reference in the records of Viruez's gastroenterologist that suggested he was currently seeking treatment for anxiety or depression. These concessions are significant because Dr. Stern was forced to establish that any symptoms of or treatment for anxiety or depression by Viruez during the pre-existing condition period were evidence that he suffered from PTSD prior to January 1, 2019. In order to make this argument, Dr. Stern had to go out on a limb and argue Viruez had the exact same symptoms of PTSD that he had when he was previously being treated for depression or anxiety. Not having met or talked to Viruez about his symptoms, Dr. Stern appeared to have no idea what mental health symptoms Viruez experienced due to PTSD and those due to depression and anxiety.

61.     Having conceded the previous facts he relied upon to reach his initial conclusion about Viruez were wrong, he was forced to set forth an extremely broad argument unsupported by any evidence why Viruez's new diagnosis of PTSD was still a pre-existing condition despite the fact he was first diagnosed with the disease in January 2019. He argued: (1) the treatment Viruez

received during the pre-existing condition period for anxiety was "inextricably related to what was subsequently diagnosed as PTSD" by Wei; (2) symptoms of anxiety and depression are a "significant" part of PTSD; and (3) Viruez had a psychiatric condition during the pre-existing condition period, namely, anxiety for which he was prescribed clonazepam.  According to Dr. Stern, even though Viruez was not diagnosed with PTSD during the pre-existing condition period, it did not mean he was not experiencing symptoms related to the disorder during the applicable timeframe.

62. Dr. Stern's new conclusions are ludicrous and paint Dr. Stern, a psychologist with an admirable resume and more than 25 years of experience, in an embarrassing light.  He essentially extols the principle that PTSD is inextricably entwined with depression and/or anxiety despite the fact the section for diagnostic criteria for PTSD in the DSM-5 completely refutes that position.  Indeed, it is widely accepted PTSD can be readily differentiated from depression and/or anxiety.

63. In the DSM-5, to be diagnosed with PTSD, a patient must have been exposed to a stressful or traumatic event.  The handbook sets forth the criteria a mental health professional must find in order to form a diagnosis.  Many of the following criteria and symptoms apply to Viruez based on his own statements about his symptoms and his visits with Dr. Hodnett and Christina Wei:

**Criterion A (at least one exposure)**

In order for a PTSD diagnosis to be made, the person must be exposed to death.  It doesn't matter that the person was not the one who was in danger.

**Criterion B (at least one exposure)**

Before someone can be diagnosed, they need to be re-experiencing the event on an ongoing-basis and experiencing it through nightmares, flashbacks, involuntary memories, emotional distress after being reminded of the tragedy, or a physical reaction after being reminded by the trauma.

**Criterion C (at least one exposure)**

The person is showing avoidance behaviors.  This means they are trying to avoid anything that reminds them of the trauma.  This can be through physical reminders or things that make them think about the trauma.

**Criterion D (at least two symptoms)**

The person experiences negative thoughts and feelings during the trauma.  This can include feeling negative about the world or simply just themselves, not caring about activities they used to enjoy, isolation, and difficulty recalling the event.  This also including blaming themselves or someone else for the trauma on an exaggerated level.

**Criterion E (at least two symptoms)**

PTSD diagnosis requires at least two of the following symptoms: increased aggression or irritability; hypervigilance; hard-time concentrating; problems sleeping; or increased startle response.

**Other Criteria**

The person must experience symptoms for at least a month and symptoms impact impairment or distress in normal life such as socially or at work.

64.     Dr. Stern could only opine Viruez had PTSD during the pre-existing condition period by giving examples of treatment Viruez may have received for depression and anxiety.  However, he could only reach this decision by ignoring substantially important evidence, namely, the symptoms listed in Exhibit 1.3-4 of the DSM-5.  By merely reading Dr. Hodnett's and Christina Wei's office visit notes, it becomes readily apparent Viruez started to suffer the symptoms of PTSD after his brother's murderer was released from prison in January 2019.  Approximately a month later, Wei officially diagnosed him with PTSD.  Viruez is entitled to his STD benefits because he

suffers from symptoms of PTSD that impair his ability to work and those symptoms did not occur until after the pre-existing condition period ended.

65. On May 17, 2019, Lincoln predictably denied Viruez's appeal. In its letter to Viruez, it relied solely upon Dr. Stern's irrational May 16, 2019 Memorandum to apply the pre-existing condition exclusion to Viruez's claim for STD benefits. Lincoln's decision to deny Viruez's STD benefits was utterly unreasonable and is not supported by the great weight of evidence in his claim file.

66. Because Lincoln denied his STD benefits, Viruez was forced to hire the undersigned attorney to represent him. Viruez's attorney supplemented the record by sending Lincoln a letter drafted by Christina Wei and a letter drafted by Dr. Hodnett.

67. In Dr. Hodnett's November 6, 2019 letter, he stressed Viruez could not work in any capacity due to his diagnosis of PTSD and that he was not suffering from symptoms associated with PTSD during the pre-existing condition period.

68. In Wei's December 9, 2019 letter, Wei stated Lincoln made a "grievous error when it concluded Mr. Viruez's symptoms of anxiety, depression, and insomnia during the pre-existing condition period … were purportedly inextricably linked to his diagnosis of PTSD made by me after the pre-existing condition period ended." Wei stated she first evaluated Mr. Viruez for PTSD on February 8, 2019, during which he advised her he had ceased working two weeks prior because he could not withstand the noises at work, that he had become very irritable, he was unable to get out of bed many mornings, he feared performing manual tasks such as driving, he was frequently tearful, experiencing paranoia, that he felt someone was shaking him at his shoulders, and he had tingling all over his body. Viruez advised Wei that his brother was murdered when he was sixteen and that he recently started to have nightmares of seeing decomposing bodies, including that of his brother. She noted Viruez expressly advised her that he had put away his brother's death for years

and he just started to suffer symptoms as a result of the murder, including feelings of profound guilt. Wei suspected the late onset PTSD symptoms started only recently because his brother's murderer was released from prison in early January 2019.

69.     Wei also emphasized that PTSD was a new diagnosis for Viruez and as a result she changed his medication to sertraline and ceased his prescriptions for clonazepam and Wellbutrin due to the inefficacy of those drugs to treat PTSD.  She noted she changed his prescriptions because the medications he was previously taking were completely ineffectual to treat PTSD. She also stressed that Viruez did not suffer from any symptoms of PTSD during the pre-existing condition period because while he previously complained of anxiety and insomnia, he did not complain about the above-described symptoms of PTSD until January 2019.  She criticized Liberty for insisting Viruez's symptoms of GAD and MDD overlapped with his symptoms of PTSD as its basis for denying his claim and insisted that most psychologists and psychiatrists readily distinguish PTSD from MDD and GAD because even though a few symptoms of the diagnoses may overlap, there are many symptoms that are associated only with PTSD.

70.     Due to Lincoln's unreasonable and egregious conduct in denying Lincoln's STD benefits, he is entitled to receive the amount of this benefits from the date they were due to 24 weeks after that date.   He is also entitled to have the Court remand this case to the plan administrator to consider whether he is eligible or LTD benefits.

## IV.
## COUNT ONE
## Breach of the Plans and Policy Provisions Claim

71.     Viruez has complied with his obligation to make proof of claim in accordance with the Policy's requirements and he has exhausted his remedies under the Policies.

72.     Viruez is entitled to have the Court conduct a trial *de novo* of the issues stated herein because Lincoln operated under a conflict of interest and it failed to conduct a full and fair review of Viruez's claims.

73. In the alternative, Lincoln's decision to deny Viruez's benefits was arbitrary and capricious.

74. Viruez is entitled to short-term disability benefits because Lincoln's evaluation was so flawed and self-interested that its decision to deny Viruez benefits was unreasonable.

75. The Policy provides that in the instance where Viruez is disabled—and therefore unable to perform any occupation—then he is entitled to LTD benefits under the policy.

76. The Life Policy provides that if Viruez meets the definition of disability, which meant he was unable to perform the material duties of any occupation which he or she may reasonably become qualified based on education, training, or experience, then he is entitled to those benefits.

77. The administrative record contains substantial evidence that he met the definition of disability under both Policies.

78. Lincoln failed to consider much of Viruez's medical evidence and thus it failed to provide Viruez a full and fair review of his claim that took into account all comments, documents, records, and other information submitted to it by Viruez and his medical providers.

79. Lincoln also significantly erred when it determined Viruez's diagnosis of PTSD barred him from receiving STD benefits because he purportedly experienced symptoms of PTSD during the pre-existing condition period of October 1, 2018 to December 31, 2018.

80. In reaching this conclusion, Lincoln failed to consider much of Viruez's medical records, especially those from Dr. Hodnett and Christina Wei, and thus it again failed to provide him with a full and fair review of his claim.

81. Lincoln's decision in connection with the pre-existing condition exclusion is not supported by substantial evidence, especially since its decision was solely based on the opinions of a psychologist who never met Viruez or spoke to him and who had no idea what symptoms, if

16

any, of PTSD Viruez experienced during the pre-existing condition period. Also, Lincoln's wholesale reliance on Dr. Stern to deny Viruez's claim was utterly unreasonable given he was asked to refer to the DSM-5 in forming his opinions and he unquestionably did not do so.

## V. COUNT TWO
### Reasonable and Necessary Attorney's Fees

82. Pursuant to 29 U.S.C. § 1132(g)(1), Viruez seeks an award for his reasonable and necessary attorney's fees in connection with the prosecution of this action.

### PRAYER

WHEREFORE, Viruez requests that the Court order:

1. Lincoln to pay Viruez the full employee benefits incurred and unpaid at the time of trial;

2. Lincoln to restore Viruez's employee benefits;

3. Lincoln to pay Viruez's reasonable attorney's fees incurred in pursuit of recovery of the benefits owed to Viruez;

4. Lincoln to pay Viruez pre-judgment and post-judgment interest; and,

5. Viruez recover the cost of this action and such other further relief, as the Court may deem proper under the circumstances.

Respectfully Submitted,

**THE LAW OFFICE OF JESSICA TAYLOR**
The 1150 N. Loop 1604 W., Suite 108
P.O. Box 423
San Antonio, Texas 78248
T:  210.402.4022


By: *Jessica Taylor*
JESSICA TAYLOR
Texas State Bar No. 24013546
jessica@jtaylorlaw.com